SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

Robert H. WILLIS, Martin B. Sloate, Howard Kaye and Kenneth Stein, Defendants.

No. 91 Civ. 322 (WCC).

United States District Court, S.D. New York.

March 19, 1992.

Richard H. Walker, Regional Adm'r, Robert B. Blackburn, Div. Enforcement, S.E.C., New York City (Edwin H. Nordlinger, Carmen J. Lawrence, Dorothy Heyl, Gregory J. Johnson, of counsel), for plaintiff.

Shereff, Friedman, Hoffman & Goodman (Andrew J. Levander, of counsel), and Hoffinger, Friedland, Dobrish, Bernfeld & Hasen (Jack S. Hoffinger, of counsel), New York City, for defendant Martin B. Sloate.

## OPINION AND ORDER

WILLIAM C. CONNER, District Judge:

In this action, the Securities and Exchange Commission (the "SEC") charges defendant Martin B. Sloate ("Sloate") with violating Section 10(b) of the Securities Exchange Act, and Rule 10b–5 promulgated thereunder, under the misappropriation theory of liability. This matter is before the Court on the motion of defendant Sloate to reargue this Court's denial of his motion to dismiss the Complaint. Sloate contends that the Second Circuit's *en banc* decision in *United States v. Chestman*, 947 F.2d 551 (2d Cir.1991), *petition for cert. filed*, No. 91–1085 (U.S. Jan. 2, 1992) (hereinafter "*Chestman II*"), as well as a recent motion in a criminal case against a former defendant herein, Robert H. Willis ("Willis"), support reargument of certain of the issues already presented by Sloate and rejected by this Court in its decision of November 15, 1991, 777 F.Supp. 1165. The Court assumes familiarity with its earlier decision.

## BACKGROUND

For purposes of the pending motion, the Court assumes the facts alleged in the SEC's Complaint to be true. The Complaint alleges that Willis, a psychiatrist, breached his fiduciary duty to a patient,

Joan Weill, the wife of Sanford Weill, when he traded in securities while in possession of certain of Mrs. Weill's patient confidences, consisting of material, nonpublic information about her husband's involvement in confidential corporate matters affecting those securities. Cmplt. at ¶¶ 15–17. In 1981, she confided in Willis information about the imminent merger of Shearson Loeb Rhoades ("Shearson"), of which her husband was Chief Executive Officer ("CEO"), and American Express Company (the "Shearson merger") (Cmplt. at ¶¶ 18–21); and, in 1986, she related information about Weill's interest in, and plan to take over, BankAmerica Corp. ("BankAmerica") (Cmplt. at ¶¶ 40–42, 47).

Commencing on or about April 3, 1981, Willis communicated to Sloate material, nonpublic information about the Shearson merger which Willis had obtained in confidence from Mrs. Weill. Cmplt. at ¶ 25. From on or about April 9 through 14, 1981, Sloate, while in possession of the information, traded in Shearson securities for his own account and for at least two of his customer accounts. Cmplt. at ¶¶ 27–28. Commencing on or about January 14, 1986, Willis communicated to Sloate material, nonpublic information about Weill's BankAmerica plans which Willis had obtained in confidence from Mrs. Weill. Cmplt. at ¶ 52. From on or about January 22, 1986 through on or about February 11, 1986, while in possession of the information, Sloate traded in BankAmerica securities for his own account and on behalf of his customers. Cmplt. at ¶¶ 55, 57.

The Complaint further alleges that (1) Sloate tipped Stein, his customer and friend, confidential information about both the Shearson merger and Weill's BankAmerica plans (Cmplt. at ¶¶ 30, 63), and (2) he tipped Kaye, his friend and neighbor, about Weill's BankAmerica plans (Cmplt. at ¶ 60). Sloate allegedly communicated to Stein and Willis that the information had been obtained from a friend who was a psychiatrist, and that the psychiatrist's source of that information was a Willis patient who was a Weill family member. Cmplt. at ¶¶ 30, 60, 63. Sloate is alleged to have earned profits and commissions on the purchases and sales of the Shearson and BankAmerica stock for himself and for his customers. Cmplt. at ¶¶ 32, 36, 38, 56, 58.

## DISCUSSION

### Standard for Reargument

■■■ The standard for granting a motion for reargument is strict in order to preclude repetitive arguments on issues that have already been considered fully by the court. *Ruiz v. Commissioner of D.O.T. of City of New York*, 687 F.Supp. 888, 890 (S.D.N.Y.), *aff'd*, 858 F.2d 898 (2d Cir.1988). Such motions may be granted only where the court has overlooked matters or controlling decisions which might have materially influenced the earlier decision. *See Caleb & Co. v. E.I. DuPont De Nemours & Co.*, 624 F.Supp. 747, 748 (S.D.N.Y.1985) (citing *New York Guardian Mortgagee Corp. v. Cleland*, 473 F.Supp. 409, 420 (S.D.N.Y.1979)).

### Sloate's Motion to Reargue

■■■ In support of his motion to reargue, Sloate contends that this Court considered, but misconstrued, a controlling precedent, *Chestman II*. In addition, Sloate points to former defendant Willis's withdrawal of his guilty plea in the criminal action entitled *United States v. Willis*, 89 Cr. 561 (MGC), a case involving many of the same facts alleged in the Complaint in this action. The purpose of Willis's plea withdrawal was to allow Judge Cedarbaum to reconsider her earlier decision denying Willis's two prior motions to dismiss the indictment, *see United States v. Willis*, 737 F.Supp. 269 (S.D.N.Y.1990), in light of the recently issued *en banc* decision in *Chestman II*. Judge Cedarbaum denied Willis's renewed motion. *See United States v. Willis*, 778 F.Supp. 205 (S.D.N.Y.1991).

In *Chestman II*, the Second Circuit found that the evidence was insufficient to establish a fiduciary relationship or its functional equivalent between a husband and his wife or her family, so as to support a conviction of the husband's tippee under the misappropriation theory. Sloate seizes on the fact that the critical relationship in

*Chestman II* was that between husband and wife to argue that the instant Complaint is insufficient since it does not allege a fiduciary relationship between Mr. and Mrs. Weill. Building on this premise, Sloate argues that *Chestman II* requires that there be an unbroken chain of confidentiality, and that once the information is disclosed to a non-fiduciary, there can be no liability under the misappropriation theory for one who subsequently trades on that information, even if he does so in breach of his duty of trust and confidence.

The Court cannot agree with Sloate's analysis. In a misappropriation case, the Complaint must allege a breach of a fiduciary relationship or a similar relationship of trust or confidence. *United States v. Carpenter*, 791 F.2d 1024 (2d Cir.1986), *aff'd*, 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987). "[T]he critical relationship is the one between the misappropriator and the person to whom the misappropriator owes a fiduciary duty, and not the relationship between such person and any insider source of the information." *United States v. Willis*, 778 F.Supp. 205, 208 (S.D.N.Y.1991). In *Chestman II*, the government charged that Keith Loeb misappropriated confidential information from his wife, Susan Loeb—consequently, the relationship between husband and wife was pertinent. In the instant case, the government has alleged that Sloate was a tippee of confidential information misappropriated by Dr. Willis from his patient, Mrs. Weill. In this case, the analogous relationship to that between Keith Loeb and his wife is the relationship between Dr. Willis and his patient. Contrary to defendant's assertions, *Chestman II* in no way requires that the SEC plead a relationship of trust and confidence between Mr. and Mrs. Weill in order to hold Sloate liable as Willis's tippee.

The Court similarly cannot agree with Sloate's contention that *Chestman II* stands for the proposition that once information is disclosed to a non-fiduciary who has no obligation to keep it confidential, the information becomes public and any subsequent recipient of the information can use it without liability. *Chestman II* fashioned no new rules of liability with respect to the misappropriation theory. On the contrary, the Second Circuit simply found that there was insufficient evidence to establish that a required element of the misappropriation claim had been satisfied—namely, that there be a breach of a fiduciary relationship or other similar relationship of trust or confidence. The Complaint in the instant action is sufficient to support an action under Section 10(b) and Rule 10b–5 on the misappropriation theory—it alleges that Sloate traded on material, nonpublic information which Willis had obtained in breach of the fiduciary duty owed by a psychiatrist to his patient. While noting that to date it had applied the misappropriation theory only in the context of employment relationships, the Second Circuit in *Chestman II* suggested several factors, which if present, would demonstrate a fiduciary or similar relationship of trust and confidence in the context of Rule 10b–5 liability:

> A fiduciary relationship involves discretionary authority and dependency: One person depends on another—the fiduciary—to serve his interests. In relying on a fiduciary to act for his benefit, the beneficiary of the relation may entrust the fiduciary with custody over property of one sort or another. Because the fiduciary obtains access to this property to serve the ends of the fiduciary relationship, he becomes duty-bound not to appropriate the property for his own use. What has been said of an agent's duty of confidentiality applies with equal force to other fiduciary relations: 'an agent is subject to a duty to the principal not to use or to communicate information confidentially given him by the principal or acquired by him during the course of or on account of his agency.' Restatement (Second) of Agency § 395 (1958). These characteristics represent the measure of the paradigmatic fiduciary relationship. A similar relationship of trust and confidence consequently must share these qualities.

947 F.2d at 569.

The relationship between a psychiatrist and his patient shares these qualities—the patient depends on the psychiatrist for

treatment; he entrusts the psychiatrist with information in the course of treatment which the psychiatrist is duty-bound not to appropriate for his own use. In short, as noted by Judge Cedarbaum, "[i]t is difficult to imagine a relationship that requires a higher degree of trust and confidence than the traditional relationship of physician and patient." *United States v. Willis*, 737 F.Supp. at 272.

*Materiality With Respect to the BankAmerica Information*

■ Sloate again argues that the SEC's Complaint fails to state how the alleged nonpublic information regarding Weill's BankAmerica plans was material. As this Court previously noted, the question of materiality cannot be resolved on a motion to dismiss unless the undisclosed facts are "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir.1985).

Although Sloate characterizes Weill's plan to run BankAmerica a "fantasy," the Court cannot conclude on this motion to dismiss that, at the time Sloate allegedly possessed the information and traded on it, such plans were so obviously unimportant that reasonable investors would not have considered them important in the context of the "total mix" of information available. *See Basic, Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). In *Basic*, the Supreme Court rejected a bright line test for defining "materiality" in favor of a balancing test which takes into account the magnitude of a proposed event and the probability of its occurrence. 485 U.S. at 232–41, 108 S.Ct. at 983–989. Since it is purely a factual inquiry, the probability of Mr. Weill's becoming CEO of BankAmerica cannot presently be determined.

Nor can we say at this time that the event, had it occurred, would not have had a significant impact on the company's fortunes. Moreover, Weill's ultimate failure to accomplish his plan does not necessarily lead to the conclusion that the company's investors would not have considered information about those plans to be material.[1]

As the Court noted in its previous Opinion and Order, the allegations of the Complaint are sufficient to support an inference that material, nonpublic information was tipped to Sloate. The Complaint alleges that in January or February of 1986, Weill "was considering a proposal to change the management of BankAmerica, including becoming its Chief Executive Officer." Cmplt. at ¶ 40. It also alleges that Weill was engaged in confidential discussions concerning these plans and his steps to secure a commitment from Shearson to invest capital in BankAmerica if, among other things, Weill succeeded in becoming CEO. Cmplt. at ¶¶ 40–41. According to the Complaint, Weill told his wife material, nonpublic information concerning his possible takeover of BankAmerica, about confidential meetings, and about the $1 billion commitment from Shearson, provided Weill became CEO. Cmplt. at ¶ 42. The Complaint alleges that Mrs. Weill confided certain material, nonpublic information to Willis concerning the BankAmerica plans (Cmplt. at ¶ 47) and that Willis communicated material, nonpublic information concerning those plans to Sloate (Cmplt. at ¶ 52). The SEC need not prove these allegations on this motion to dismiss—proof of the detailed substance of these communications must await trial, at which time it will be determined whether a reasonable investor would have considered what Sloate was told to be important in the total mix of information.[2]

---

1. The Court has considered and rejects Sloate's argument that "the trading information now before the Court establishes conclusively that the market did not consider Mr. Weill's 'fantasy' to be material." Defs. Reply Memo. at 8. As the Court has previously noted, trading history may aid in a determination of materiality, but *is not dispositive on a motion to dismiss.* The many factors which may have influenced a stock's price on any given day is a factual inquiry not suitable on this motion.

2. The Court need not consider whether the SEC's reference to and submission of newspaper articles in its opposition papers was proper since *consideration of those articles was unnec-essary to the Court's determination with respect to materiality.*

## CONCLUSION

For the foregoing reasons, the Court reaffirms its Opinion and Order of November 15, 1991.

SO ORDERED.